## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GEORGE KONTONOTAS,** | : | **CIVIL ACTION NO.** |
| **Plaintiff** | : | **07-4989** |
| | : | |
| **v.** | : | |
| | : | |
| **HYGROSOL PHARMACEUTICAL** | : | |
| **CORPORATION and SPIRO SPIREAS,** | : | |
| **Defendants** | : | **JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

Plaintiff George Kontonotas, by and through his undersigned counsel, hereby files the following amended complaint against the defendants in the above-captioned case.

## JURISDICTIONAL STATEMENT

1.   This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332.

2.   Mr. Kontonotas brings this action to recover for (a) defendant Hygrosol Pharmaceutical Corporation's breach of a written contract in which Hygrosol Pharmaceutical, the drafter of the contract, promised to pay Mr. Kontonotas commissions, and (b) defendant Spiro Spireas' breach of the doctrine of quantum meruit. Both theories of recovery are articulated in greater detail below[1].

3.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), since all defendants reside in this district and certain events giving rise to the claims occurred in

---

[1] Defendants filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6) in response to Mr. Kontonotas' original complaint. Mr. Kontonotas has the right to file this amended complaint in response to defendants' motion to dismiss, since Fed.R.Civ.P. 15(a) permits him to file one amended complaint "as a matter of course" before service of a "responsive pleading." Fed.R.Civ.P. 15(a). A motion to dismiss under Rule 12(b)(6) is not a "responsive pleading" and therefore does not preclude Mr. Kontonotas from filing an amended complaint. Fed.R.Civ.P. 7(a), (b); *Centifanti v. Nix*, 865 F.2d 1422, 1431 & n. 9 (3rd Cir. 1989); *see also Shaver v. Operating Engineers Local 428 Pension Trust Fund*, 332 F.3d 1198, 1201 (9th Cir. 2003); *Bowden v. United States*, 176 F.3d 552, 555 (D.C. Cir. 1999).

this district.   Moreover, defendants have consented to jurisdiction in this Court jurisdiction as part of an agreement to remove this case from arbitration in the American Arbitration Association.

## THE PARTIES

4.   Plaintiff George Kontonotas ("Mr. Kontonotas") is a resident of New York who resides at 1 Long Acre Lane, Dix Hills, New York 11746.

5.   Defendant Hygrosol Pharmaceutical Corporation ("Hygrosol Pharmaceutical") is a Pennsylvania corporation with principal place of business at 15 Eagleton Farm Road, Newtown, Pennsylvania and Sigma Farm Labs, 860 Tocon Center Drive, Langhorne, PA 19047.

6.   Upon information and belief, Hygrosol's sole shareholder and chief executive officer is defendant Spirodon Spireas, whose principal place of business at 15 Eagleton Farm Road, Newtown, Pennsylvania.

## FACTUAL HISTORY

7.   Mr. Kontonotas is a salesman with experience in the pharmaceutical, health and nutrition industries.

8.   In the mid-1990's, Mr. Kontonotas' business colleague, John Botsolakis, introduced Mr. Kontonotas to Spireas, a professor.

9.   Spireas told Mr. Kontonotas that he had expertise in formulating chemical processes as a professor at Long Island University, and in addition, he owned a patent that could be used to make products and a lot of money for everybody.

10.   Spireas also stated to Mr. Kontonotas that he owned a patent covering a chemical process called "Hygrosol," and that Hygrosol could make a lot of money for all

of them (Botsolakis, Kontonotas and Spireas), as could non-Hygrosol products that Spireas had developed or was developing.

11.  To facilitate ventures involving Hygrosol and non-Hygrosol products, Spireas asked Mr. Kontonotas to find him a job with a pharmaceutical company.

12.  In late 1997 or early 1998, Mr. Kontonotas arranged a meeting between Kontonotas and representatives from United Research Laboratories and Mutual Pharamaceutical Co., Inc. ("URL/Mutual") at the Marriott Hotel in Lodi, New Jersey.

13.  The individuals who attended the meeting were Mr. Kontonotas, Spireas, Richard Roberts (president and CEO of URL/Mutual), Kathy Gianetti (a sales employee at URL/Mutual) and Sandy Bolton, president of Hygrosol Pharmaceutical and a business colleague of Spireas.

14.  Subsequent to the meeting, Roberts and Giannetti contacted Spireas and hired him.  Upon information and belief URL/Mutual first hired Spireas as a consultant until he was able to resign from his position as professor at Long Island University.  Thereafter, upon information and belief, URL/Mutual hired Spireas to the position of vice-president of research and development.

15.  At or about the time that URL/Mutual hired Spireas, Mr. Kontonotas and Hygrosol Pharmaceutical entered into a written agreement (exhibit "A") ("the agreement") that specified that Hygrosol Pharmaceutical would pay Mr. Kontonotas commissions from "formulas" using Hygrosol technology.

16.  The agreement was drafted by Hygrosol Pharmaceutical.

17.  Hygrosol Pharmaceutical acknowledged in the preamble to the agreement that it "has the ability to formulate for the purposes of selling raw materials and or other

3

nutritional products with various delivery systems using its patented hygrosol technology in connection with products used in and or by health and nutritional companies all of which shall be hereinafter referred to as the "Products".

18.    Hygrosol Pharmaceutical further acknowledged in the preamble to the agreement that it "desires to access, develop and market said products to companies in the health and nutritional field."

19.    Hygrosol Pharmaceutical further acknowledged in the preamble to the agreement:

> Broker desires to have exclusivity of the Hygrosol Technology from the Company for the purpose of marketing said technology to companies in the Health and Nutritional Industry, but not including pharmaceutical (prescription and OTC products) other than current agreement being negotiated with Mutual Pharmaceuticals and any of their affiliated companies.  This agreement between the Company and the Broker/Agent does not pertain to any future agreements to be negotiated with Mutual Pharmaceuticals and obligations of the Company and Mutual Pharmaceuticals to the Broker/Agent, such obligation will be negotiated separately.

20.  Hygrosol Pharmaceutical provided in paragraph 1.1 of the agreement:

> It is understood that the company shall pay a commission to the Broker/Agent for all formulas using the patented Hygrosol Technology for products designed by the company for other corporations which have been introduced to the company by the broker or entities related to the health and nutritional field (directly or indirectly).  A 15% percent commission of the gross sales of billings which are received by the Company will be paid to the Broker/Agent (or his heirs) less the amount of reasonable expenses (not to exceed 10% of the total dollar amount received by the company unless previously agreed upon by the Broker/Agent) no later than 15 days after the company receives payment for the goods and/or services provided by the company to the health & nutritional customers.  All commissions will be accompanied by an invoice outlining the transaction resulting to the said commissions.

21.  Hygrosol Pharmaceutical provided in paragraph 1.2 of the agreement:

> No commission will be payable for sales to pharmaceutical companies, and the broker does not have a license to market the Products to pharmaceuticals or for pharmaceutical uses.  The Broker is not the Company's agent for the purpose of

marketing the Products to pharmaceutical companies or for pharmaceutical uses other than the current agreement being negotiated with Mutual Pharmaceuticals and any of their affiliated companies in which instance, the Broker will receive a commission from the company and will be negotiated separately.

22. Hygrosol Pharmaceutical provided in paragraph 1.4 of the agreement:

If the Company's (not the Broker) locates a customer for the products and such customer is in the health and nutritional field, the Broker will be entitled to a commission of 10% of the gross receipts, less the amount of reasonable expenses as described in provision (1.1) incurred by the Company. Such commission will be paid no later than 15 days after the Company receives money for the product(s) provided by the Company to the health and nutritional customers located by the Company. This commission will be owed to the Broker/Agent for transactions entered into while the agreement is in effect.

23. Between late 1998 and 2005, Mr. Kontonotas communicated with Spireas concerning the progress of Spireas' projects at URL/Mutual. Spireas repeatedly assured Mr. Kontonotas that he would compensate him "when the right time comes" for Hygrosol and non-Hygrosol products that Spireas developed for URL/Mutual.

24. In the spring of 2005, Mr. Kontonotas learned that URL/Mutual was starting to sell Felodipine, a product that Mr. Kontonotas believed Spireas developed for URL/Mutual using the Hygrosol process.

25. Later in 2005, Mr. Kontonotas learned from a URL/Mutual press release that URL/Mutual was expecting record sales in excess of $530 million, a 35% increase over record sales of $385 million in 2004. The press release stated that the increase in sales was largely due to Felodipine, a product that Mr. Kotonotas believes Spireas developed for URL/Mutual using the Hygrosol process.

26. Subsequently, Mr. Kontonotas requested that Hygrosol Pharmaceutical pay him his commissions due under the agreement, and that Spireas compensate him for all non-Hygrosol products.

27.   Spireas and Hygrosol Pharmaceutical have failed and/or refused to compensate Mr. Kontonotas.

28.  Indeed, during 2007, Spireas claimed not to remember the agreement that he entered into with Mr. Kontonotas on behalf of Hygrosol Pharmaceutical.

## COUNT I – KONTONOTAS v. HYGROSOL PHARMACEUTICAL BREACH OF CONTRACT

29.  Paragraphs 1-28 of the amended complaint are incorporated by reference as if stated in full herein.

30.   Mr. Kontonotas entered into a written agreement with Hygrosol Pharmaceutical wherein Hygrosol Pharmaceutical promised to pay Mr. Kontonotas commissions for sales of products using Hygrosol technology.

31.   Mr. Kontonotas is entitled to commissions under paragraph 1.1 of the agreement, or in the alternative, paragraph 1.2 of the agreement, or in the second alternative, paragraph 1.4 of the agreement.   Paragraphs 1.1, 1.2 and 1.4 are all sufficiently definite as to be enforceable.

32.  In or about 2005, URL/Mutual made record sales of $530 million, an increase of $145 million from 2004, and attributed this increase in sales to Felodipine, a product that Mr. Kontonotas believes and avers Spireas developed through use of the Hygrosol process.

33.  Mr. Kontonotas believes and therefore avers that URL/Mutual did not begin to earn revenues from Hygrosol products developed by Spireas until 2005.

34.   Mr. Kontonotas is entitled to commissions under his agreement with Hygrosol Pharmaceutical for revenues from Hygrosol products that Spireas developed for URL/Mutual.

35.  Mr. Kontonotas' cause of action did not ripen until 2005, when URL/Mutual began to earn revenues from Hygrosol products developed by Spireas.

**WHEREFORE**, Mr. Kontonotas respectfully requests entry of judgment in his favor and against Hygrosol Pharmaceutical in excess of $75,000 for all commissions to which Mr. Kontonotas is entitled under the written agreement with Hygrosol Pharmaceutical, plus interest, court costs, pre-judgment interest and post-judgment interest.

## COUNT II – KONTONOTAS v. SPIREAS
## QUANTUM MERUIT AND/OR UNJUST ENRICHMENT

36.  Paragraphs 1-35 of the amended complaint are incorporated by reference as if stated in full herein.

37.  Mr. Kontonotas, acting in good faith, expended time and effort in bringing Spireas together with URL/Mutual for the purpose of developing pharmaceutical products using Spireas' knowledge and expertise in formulations.

38.  Spireas accepted Mr. Kontonotas' efforts by developing Hygrosol and non-Hygrosol products for URL/Mutual for which Spireas has received millions of dollars.

39.  Mr. Kontonotas conferred a substantial benefit upon Spireas through efforts that led to Spireas receiving millions of dollars from URL/Mutual.

40.  Mr. Kontonotas believes and therefore avers that Spireas did not begin to earn revenues from pharmaceutical products that he developed for URL/Mutual until 2005.

41.  Under these circumstances, Mr. Kontonotas has a reasonable expectation of compensation from Spireas for his services.

42.  Mr. Kontonotas' cause of action did not ripen until 2005, when Spireas began to receive revenues from pharmaceutical products that he developed for URL/Mutual.

7

43.   Mr. Kontonotas believes and therefore avers that Spireas has been compensated by URL/Mutual in the amount of over $20,000,000 in 2005 alone.

44.   It would be manifestly unjust for Spireas to retain the benefit conferred by Mr. Kontonotas without payment of value.

45.   Mr. Kontonotas is entitled to payment of 15% of all monies received by Spireas from URL/Mutual as compensation for developing Hygrosol and non-Hygrosol products.

**WHEREFORE**, Mr. Kontonotas respectfully requests entry of judgment in his favor and against Spireas in an amount in excess of $75,000 that is equivalent to the reasonable value of the benefit that Mr. Kontonotas conferred upon Spireas (i.e., 15% of all monies received by Spireas from URL/Mutual as compensation for developing Hygrosol and non-Hygrosol products), plus interest, court costs, pre-judgment interest and post-judgment interest.

### COUNT III – KONTONOTAS v. HYGROSOL PHARMACEUTICAL QUANTUM MERUIT AND/OR UNJUST ENRICHMENT

46.   Paragraphs 1-45 of the amended complaint are incorporated by reference as if stated in full herein.

47.   Mr. Kontonotas has alleged in Count I, *supra*, that paragraphs 1.1, 1.2 and 1.4 of the agreement are sufficiently definite as to be enforceable against Hygrosol Pharmaceutical.

48.   Assuming *arguendo* that paragraphs 1.1, 1.2 and 1.4 are not sufficiently definite, Mr. Kontonotas has a valid cause of action against Hygrosol Pharmaceutical for quantum meruit and/or unjust enrichment.

49.  Mr. Kontonotas, acting in good faith, expended time and effort in bringing Hygrosol Pharmaceutical together with URL/Mutual for the purpose of developing pharmaceutical products using Hygrosol Pharmaceutical's knowledge and expertise in formulations.

50.  Hygrosol Pharmaceutical accepted Mr. Kontonotas' efforts by developing Hygrosol and non-Hygrosol products for URL/Mutual for which Hygrosol Pharmaceutical has received millions of dollars.

51.   Mr. Kontonotas conferred a substantial benefit upon Hygrosol Pharmaceutical through efforts that led to Hygrosol Pharmaceutical receiving millions of dollars from URL/Mutual.

52.  Mr. Kontonotas believes and therefore avers that Hygrosol Pharmaceutical did not begin to earn revenues from pharmaceutical products that it developed for URL/Mutual until 2005.

53.  Under these circumstances, Mr. Kontonotas has a reasonable expectation of compensation from Hygrosol Pharmaceutical for his services.

54.  Mr. Kontonotas' cause of action did not ripen until 2005, when Hygrosol Pharmaceutical began to receive revenues from pharmaceutical products that it developed for URL/Mutual.

55.  Mr. Kontonotas believes and therefore avers that Hygrosol Pharmaceutical has been compensated by URL/Mutual in the amount of over $20,000,000 in 2005 alone.

56.  It would be manifestly unjust for Hygrosol Pharmaceutical to retain the benefit conferred by Mr. Kontonotas without payment of value.

57. Mr. Kontonotas is entitled to payment of 15% of all monies received by Hygrosol Pharmaceutical from URL/Mutual as compensation for developing Hygrosol and non-Hygrosol products.

**WHEREFORE**, Mr. Kontonotas respectfully requests entry of judgment in his favor and against Hygrosol Pharmaceutical in an amount in excess of $75,000 that is equivalent to the reasonable value of the benefit that Mr. Kontonotas conferred upon Hygrosol Pharmaceutical (i.e., 15% of all monies received by Hygrosol Pharmaceutical from URL/Mutual as compensation for developing Hygrosol and non-Hygrosol products), plus interest, court costs, pre-judgment interest and post-judgment interest.

Respectfully submitted:

Eugene J. Malady, Esquire
200 East State Street
Suite 309
Media, PA 19063
(610) 565-5000

Thomas D. Schneider, Esquire
55 Green Valley Road
Wallingford, PA 19086
(610) 565-1134

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GEORGE KONTONOTAS,** | : | **CIVIL ACTION NO.** |
| **Plaintiff** | : | **07-4989** |
| | : | |
| **v.** | : | |
| | : | |
| **HYGROSOL PHARMACEUTICAL** | : | |
| **CORPORATION and SPIRO SPIREAS,** | : | |
| **Defendants** | : | **JURY TRIAL DEMANDED** |

## CERTIFICATE OF SERVICE

I, Eugene J. Malady, Esquire, herby certifies that the foregoing Amended Complaint was

served on the following by either First Class mail, postage pre-paid or via Electronic Notice:

Steven A. Haber, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
ONE PENN CTR 19TH FL
1617 JFK BOULEVARD
PHILADELPHIA, PA 19103
Email: steven.haber@obermayer.com

James Everett Kurack , Esquire
OBERMAYER, REBMAN, MAXWELL & HIPPEL
1617 JOHN F. KENNEDY BOULEVARD
19TH FLOOR
PHILADELPHIA, PA 19103
Email: james.kurack@obermayer.com

DATE: 6/2/08

_____
EUGENE J. MALADY, ESQUIRE



## AGREEMENT

This agreement dated the 2nd day of December, 1997, made between George Kontonotas having his principal place of business at 450 Commack Rd., Deer Park, New York hereinafter referred to as "Broker / Agent, and Hygrosol Pharmaceutical Corp. having a principal place of business at 177 Arlington Avenue, Clifton, New Jersey, hereinafter referred to as the "Company".

Whereas, it is hereby acknowledged that the Company, has the ability to formulate for the purposes of selling raw materials and or other nutritional products with various delivery systems using its patented hygrosol technology in connection with products used in and or by health and nutritional companies all of which shall be hereinafter referred to as the "Product(s)".

Whereas, the Company desires to access, develop and market said products to Companies in the health and nutritional field.

Whereas, Broker desires to have exclusivity of the Hygrosol Technology from the Company for the purpose of marketing said technology to companies in the Health and Nutritional Industry, but not including pharmaceutical (prescription and OTC products) other than current agreement being negotiated with Mutual Pharmaceuticals and any of their affiliated companies. This agreement between the Company and the Broker/Agent does not pertain to any future agreements to be negotiated with Mutual Pharmaceuticals and obligations of the Company and Mutual Pharmaceuticals to the Broker/Agent, such obligation will be negotiated separately.

Now, therefore, in consideration of the mutual promises contained herein, the parties agree as follows:

## SECTION I
## COMMISSIONS

1.1   It is understood that the company shall pay a commission to the Broker / Agent for all formulas using the patented Hygrosol Technology for products designed by the company for other corporations which have been introduced to the company by the broker or entities related to the health and nutritional field (directly or indirectly). A 15% percent commission of the gross sales of billings which are received by the Company will be paid to the Broker / Agent (or his heirs) less the amount of reasonable expenses (not to exceed 10% of the total dollar amount received by the company unless previously agreed upon with the Broker/Agent) no later than 15 days after the company receives payment for the goods and / or services provided by the company to the health & nutritional customers. All commissions will be accompanied by an invoice outlining the transaction resulting to the said commissions.

1.2   No commission will be payable for sales to pharmaceutical companies, and the broker does not have a license to market the Products to pharmaceuticals companies or for pharmaceuticals uses. The Broker is not the Company's agent for the purpose of marketing the Products to pharmaceutical companies or for pharmaceutical uses other than the current agreement being negotiated with Mutual Pharmaceuticals and any of their affiliated companies in which instance, the Broker will receive a commission from the company and will be negotiated separately

1.3   Broker must look only to the Company for his entire fee, commission, or other payment in connection with the Broker's marketing of the Products. If the Broker receives any fee, commission, or other payment for the Products from any person or entity other than the Company, the Broker shall be liable to the Company for the entire amount. This provision is without waiver, by the Company, of any other rights and remedies available to it.

Page 2 of 4

1.4   If the Company's (not the Broker) locates a customer for the products and such customer is in the health and nutritional field, the Broker will be entitled to a commission of 10% of the gross receipts, less the amount of reasonable expenses as described in provision (1.1) incurred by the Company. Such commission will be paid no later than 15 days after the Company receives money for the product(s) provided by the Company to the health and nutritional customers located by the Company. This commission will be owed to the Broker/Agent for transactions entered into while the agreement in effect.

## SECTION II
## NO-CIRCUMVENTION

2.1   Except as provided herein, the Company hereto on behalf of itself as an entity, individual(s), and/or on behalf of any legal entity or individual of which a party is a principal, employer or Agent, promises, covenants and agrees that it will not circumvent the Broker with respect to any business transacted with the Customer in connection with the Product. Except as otherwise provided herein, it is hereby agreed by and between the parties that unless Company receives the consent of the Broker in writing to directly sell to the Customer without the need to report the sale to the Broker, it shall always keep the Broker informed as to its dealings with the Customer and shall be liable to the Broker for commissions resulting from any and all sales in accordance with this agreement. It is further understood that the company will direct all calls from Health and Nutritional companies to Broker/Agents for further follow up.

2.2   If the Company circumvents the Broker and receives a payment for the Product(s) from a Customer, the Broker, in addition to other legal remedies, shall be entitled to the amount of compensation it would have received had it been involved in the transaction. If litigation commences as a result of circumvention, the prevailing party shall be entitled to recover all expenses, including reasonable attorneys fees and court costs incurred in bringing an action to enforce the provisions of this section.

2.3   It is understood that if the Company were merely to speak to a customer regarding the Product(s) that, alone, would not be deemed a circumvention.

2.4   The Broker agrees to compensate the Company for reasonable attorney fees incurred for the reviewing, drafting, revising, and or commenting of the initial agreement with potential nutritional accounts.

## SECTION III
## INDEMNIFICATION

The parties hereto agree to indemnify each other, its agents, and employees, and hold the other party harmless from and against any loss or liability caused in whole or in part by that parties negligent act or omission. In addition, theCompany shall hold the Broker harmless from any and all claims from any source whether it be individual, corporate, FDA or otherwise, in connection with the products, regardless of whether said claims relate to the products efficacy, personal injury or dealth resulting from said product or products.

Page 3 of 4

## SECTION IV
## DURATION

The initial term of this Agreement shall be one year from the date the agreement is signed ( the "Initial Term" . The commissions provided for in Section 1.1 and 1.2 above on gross receipts based upon sales generated by the Broker to any Customer within the one-year Initial Term shall be due and payable provided that the monies are actually received by the Company. The Agreement will automatically renew every year unless a written letter of cancellation is given to the Broker at least thirty (30) days prior to the end of the Initial Term. In the event the Company chooses to terminate this Agreement as provided herein, in addition to any outstanding commissions due the Broker, the Company shall compensate the Broker by paying the 15% percent commission as indicated in paragraph 1.1 on the accounts that have been identified or established by the Broker and as long as any such accounts do any business with the Company directly or indirectly using its proprietary technology.

## SECTION V
## REPRESENTATION AND WARRANTIES

5.1   Broker represents that he has existing relationships with companies I the health and nutritional field that are potential customers for the Product(s).

5.2   The parties each represent tot he other that they are under no disability that would prevent them from enter into this Agreement with the other.

5.3   The broker agrees and covenants that he will not make any representations or warranties as to the Products to any person or entity other than such representations and warranties as the Company may specifically permit the Broker to make, by written letter to Broker. Broker agrees and covenants that it will not describe the Product, its nature and uses, to any actual or potential Customer except as the Company may describe the Product to the Broker in written materials provided by the Company to the Broker. The Company must provide any and all such written materials to the Broker/Agent as soon a possible or within 30 days from the Broker's request.

## SECTION VI
## MODIFICATION

This contract constitutes the full understanding of the parties as to the extent of their rights and obligations under this Agreement. No oral or written statements or Agreements made prior to the execution of this document shall modify the terms of this Agreement. This Agreement may not be amended unless such amendment is in writing, signed by the parties, and specifically indicates that it amends this Agreement.

## SECTION VII
## GOVERNING LAW

This Agreement shall be construed in accordance with the law of the state of New York and may be enforced in any New York court of compenent jurisdiction. The parties have the right to enforce this Agreement regardless of the custom or conduct of a party at any time in refraining from such enforcement. Failure of a party to enforce its rights under this Agreement shall not be construed as a waiver of the right to enforce this Agreement in the future.

Page 4 of 4

## SECTION VIII
## ARBITRATION

The parties agree that all disputes arising under this Agreement shall be submitted and finally settled by arbitration in New York.  Arbitration shall be conducted before one or more arbitrators in accordance with the rules of arbitration of the American Arbitration Assocation.  Judgment on the arbitration award may be entered in any Court with proper jurisdiction.

## SECTION IX
## SEVERABILITY

Should any provision of this Agreement be held invalid or unenforceable, the remaining provision of this Agreement shall not be effected or impaired.

## SECTION X
## BINDING EFFECT

Subject to the provisions contained herein, this Agreement shall insure to the benefit of and be binding on the parties to this Agreement, their successors, trustees, assigns, receivers, and legal representatives.

IN WITNESS WHEREOF, the parties have executed this Agreement at on this the  day of October, December 1997.

Hygrosol Pharmaceutical Corp.

WITNESSETH: DATE

By: _____
    Dr. Spiros Spireas
    Vice President

December 10, 1997

WITNESSETH: DATE

By: _____
    Dr. Sanford Bolton
    President

December 10, 1997

By: _____
    George Kontonotas
    President

12/17/97

BACK IN FILE